UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>        Plaintiff,<br><br>    v.<br><br>MONICA SOLORIO,<br><br>        Defendant. | Case No. 3:19-cr-00409-WHO-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 30 |

    Defendant Monica Solorio was sitting in the driver's seat of a running car when a uniformed officer made a U-turn, parked several yards behind her with his spotlight on, and began speaking with another individual who was outside of the car. After a second officer arrived on scene, he approached the passenger side of the car and requested Solorio's identification. Now Solorio moves to suppress the drugs and drug paraphernalia that were recovered during a subsequent search, arguing that she was unlawfully seized when the second officer requested her identification without reasonable suspicion. Because the request for identification did not amount to a seizure under the totality of the circumstances, I will deny the motion.

## BACKGROUND

    On May 27, 2019 while on routine patrol just before 11:00 p.m., Officer Ronald Flores saw a parked white Volkswagen with two individuals inside. Flores Decl. ¶ 5; *see generally* Flores Decl. Ex. 2 (Flores Incident Report); Linker Decl. Ex. C (Flores BCF). He had seen the vehicle earlier in the day. *Id.* ¶ 5. A record check of the vehicle returned the name Rory Macdonald-Smith, whom Flores had previously encountered and knew to be on probation.[1] *Id.* Flores made a

---

[1] Flores encountered MacDonald-Smith during a traffic stop, during which time he knew MacDonald-Smith had been arrested for a drug-related offense. Flores Decl. ¶ 3.

U-turn, parked several yards behind the Volkswagen, and illuminated his patrol car's spotlight. *Id.* ¶ 6. He saw a man he recognized as Juan Pablo Garcia-Membrila exit the vehicle. *Id.* On a previous occasion Flores had arrested Membrila for a drug-related offense, and Flores knew him to be on probation. *Id.* ¶¶ 4, 6.

Flores got out of his police car and began speaking with Membrila, who said that he lived in a nearby house. Flores BCF 0:35–40. Flores asked him for identification, and Membrila initially said it was in the house. *Id.* at 1:00–03. At one point during their conversation Membrila told Flores, "I got foil on me, though." *Id.* at 2:07; Flores Decl. ¶ 6. From his prior experiences with Membrila, Flores believed that Membrila used the foil to smoke heroin. *Id.* When Flores asked Membrila who else was in the car, he responded "my girl." *Id.*; Flores BCF 2:21–24.

Officer Carlos Basurto[2] arrived about two minutes after Flores's initial contact with Membrila, and Flores asked him to check the car.[3] *See* Flores BCF 0:35–2:43; Flores Decl. ¶ 4. Basurto approached the passenger side of the car, which had the window rolled down. *Id.* ¶ 5; *see* Flores BCF 2:55–3:01 (showing Basurto walking toward the passenger side of the car). Basurto's bodycam was not turned on for his initial interaction with Solorio, who was seated in the driver's seat of the car. According to Basurto's declaration, upon approaching the car he saw foil with black burn marks both in between the passenger seat and the center console and on the floor in front of the passenger seat. Basurto Decl. ¶ 5. He recognized the foil as drug paraphernalia. *Id.* Basurto also saw smoke coming from the passenger compartment of the car. *Id.* ¶ 6. When asked about the smoke, Solorio said that Membrila was smoking a cigarette. *Id.*

Basurto's bodycam footage begins with Solorio looking through her wallet for her identification. Linker Decl. Ex. D (Basurto BCF) 0:01. The footage shows something reflective between the driver's seat and the center console. *Id.* at 0:28. Basurto asked Solorio to tell him "again" what was going on in the car. *Id.* at 0:21–0:23. She began to explain that she was

---

[2] Basurto is no longer an officer with the Petaluma Police Department. *See* Linker Reply Decl. ¶ 5, Ex. G (noting a July 16, 2019 administrative leave "in the interest of his safety and that of the general public" and a December 16, 2019 termination).

[3] Basurto recognized the white Volkswagen from his own prior contacts with Macdonald-Smith, which involved heroin. Basurto Decl. ¶¶ 2, 4.

dropping Membrila off and attempting to break up with him, but Basurto interrupted to ask her what was being smoked in the car. *Id.* at 0:24–0:30. She said she did not smoke anything, and he repeated his question, saying "I didn't say you did." *Id.* at 0:31–0:35. When she said she did not know, he said, "You're gonna lie to me." *Id.* at 0:35–0:37. Based on the smell of the smoke and having seen the foil, Basurto did not believe that Solorio was being honest. Basurto Decl. ¶ 6. Solorio provided her identification, and the conversation continued in this manner with Basurto asking what was being smoked and accusing Solorio of lying to him. *See* Basurto BCF 0:38–1:36. Basurto asked Solorio to tell him what was being smoked at least nine times.

Basurto then called to inquire whether a canine was available and reported Solorio's name, date of birth, and driver's license number. *Id.* at 2:11–2:12, 2:38–2:52, 3:07–3:24. He walked around the front of the car to Solorio's door, *id.* at 3:29, asked that she unlock her door, *id.* at 3:55–3:56, and opened her door, *id.* at 3:57–3:58. He picked up aluminum foil from the ground and placed it on the hood of the car. *Id.* at 4:06–4:08; Basurto Decl. ¶ 6. He then asked Solorio whether there was fentanyl in the car. Basurto BCF 4:16–4:17. When she did not immediately respond, he said, "I don't want to get hurt. I don't want the dog to get hurt." *Id.* at 4:20–4:22. Solorio faintly said, "Yeah," and Basurto confirmed, "There is? Okay." *Id.* at 4:25–4:28. Basurto then instructed her to step out of the car and told her that she was being detained and not arrested. *See id.* at 4:29–5:14, 5:26–6:05.

A canine officer arrived on the scene and informed Basurto that the dog positively alerted on the car. Basurto Decl. Ex. 2 (Basurto Incident Report). The search of the car produced drugs (including fentanyl) and drug paraphernalia (including glass smoking paper, two plastic straws brown residue, and a hollow glass tube with brown residue). *Id.*

## LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant "are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). The government bears the burden of proving

that a warrantless search or seizure falls within an exception to the warrant requirement. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001). Reasonableness, which is the "touchstone" of the Fourth Amendment, is "measured in objective terms by examining the totality of the circumstances," which involves a fact-specific inquiry. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

## DISCUSSION

There is no dispute that Solorio has standing to challenge the search because she had a reasonable expectation of privacy in her person and in the car. Further, there is no dispute that the officers conducted the search without a warrant, meaning that it was presumptively unlawful and that the government has the burden of establishing otherwise. *See United States v. Job*, 871 F.3d 852, 863 (9th Cir. 2017). This motion comes down to when the officers "seized" Solorio within the meaning of the Fourth Amendment and whether they had reasonable suspicion to justify the seizure at that time.

### I. THE TIMING OF THE SEIZURE

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). A person is not free to leave and is thus seized within the meaning of the Fourth Amendment "only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 555 (1980) (concluding there was no seizure where officers wore no uniforms, displayed no weapons, approached the defendant rather than summoning her, and requested but did not demand her identification and ticket); *see also United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir. 1987) (noting an individual is not free to leave if an officer's "authority and conduct" provides "no reasonable alternative except an encounter with the police"); *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (noting that a seizure has not occurred "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave"). Officers may approach an individual, ask questions, request to see identification, and seek consent to search without such

4

conduct necessarily constituting a seizure. *See Bostick*, 501 U.S. at 434–35 (citing cases).

## A. Flores's U-turn and Spotlight

Solorio first contends that she was seized when Flores's marked police car made a U-turn to approach the Volkswagen, parked his police car behind it in the middle of the street, and shined a spotlight on it. Mot. 5; Reply 2–3. According to her, at this point she had no choice but to contact Flores. Reply 2–3.

Flores's actions did not amount to a seizure of Solorio. *See* Oppo. 14–15. Although Flores was in uniform and in a marked car with an illuminated spotlight, he parked several feet behind the Volkswagen, which also had an unobstructed exit ahead of it. Although Flores's U-turn would have indicated to Solorio and Membrila that he was approaching with the intention of encountering them, Flores's bodycam footage shows that he neither issued a command to Solorio nor communicated with her at all. Instead, over the course of two minutes, he spoke only with Membrila several yards behind the Volkswagen. The facts show that Solorio was yards away from an officer who was focused on someone else and that she was in the driver's seat of a running car with more than enough room travel forward. She was free to leave within the meaning of the Fourth Amendment.

## B. Basurto's Approach and Identification Request

Solorio next asserts that even if Flores's conduct alone is not enough, she was seized when both he and Basurto were both on scene. Specifically, she argues that her encounter with police became nonconsensual when Basurto approached the passenger side of the Volkswagen in full uniform and immediately asked for her identification. Mot. 5–6; Reply 3–5. The timing of the seizure is critical for Solorio's motion and request for an evidentiary hearing because, as I discuss below, reasonable suspicion justified a seizure a few moments into the interaction between Basurto and Solorio, if not earlier.[4] The question is whether Basurto improperly seized Solorio prior to developing reasonable suspicion.

---

[4] Crediting Basurto's declaration, the foil with burn marks gave him reasonable suspicion immediately upon approaching the car; however, Solorio disputes his claims that there was foil with burn marks or drug paraphernalia visible in the car.

5

The parties dispute the application of *United States v. Kim*, 25 F.3d 1426, 1430–31 (9th Cir. 1994), in which the Ninth Circuit determined that there was no seizure within the meaning of the Fourth Amendment.  There, one law enforcement agent's car partially blocked the exit available to the defendant's car, and a second agent approached the door opposite the defendant's, asked permission to ask some questions, and requested identification.  *Id.* at 1428.  When one agent asked the defendant to step out of the car, the agent pointed to (according to the agent and the district court) or touched (according to the defendant) an item protruding from the defendant's pocket.  *Id.* at 1428–29.  The Ninth Circuit concluded that the defendant's contact with law enforcement was consensual based on the district court's finding that the agent merely pointed to the object along with the absence of "other evidence of undue intimidation or coercion in the record." *Id.* at 1430.  While acknowledging that law enforcement's contact with an individual in a vehicle is generally more intrusive than contact with a pedestrian, the court noted that the defendant's car was already parked when officers approached and partially blocked it.  *Id.* Accordingly, "this disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense ab initio, except of his own volition." *Id.*  Finally, the agent asked permission to question the defendant, which "left open the possibility of a refusal." *Id.* at 1431.

Solorio relies on a case from this district in which the Honorable Thelton J. Henderson concluded that officers had subjected a defendant to an investigatory detention.  *United States v. Nunn*, No. 14-cr-00636-TEH, 2015 WL 3764181, at *4 (N.D. Cal. June 16, 2015).  Judge Henderson applied the following five factors identified by the Ninth Circuit:
> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officers' tone or manner was authoritative, so as to imply that compliance would be compelled; and (5) whether the officers informed the person of his right to terminate the encounter.

*Id.* (citing *Orhorhaghe v. INS*, 38 F.3d 488, 494–96 (9th Cir. 1994)).  In *Nunn*, three uniformed and armed officers made a U-turn to approach the defendant, parked in a way that blocked his vehicle, told him he had been stopped, and requested his identification.  *See id.* at *2, *4. Although the officers spoke in a calm tone and requested permission to search the defendant, which he declined, Judge Henderson concluded that a reasonable person would not have felt free

6

to leave and noted that the defendant was not so informed. *Id.* at *4.

In light of the authority above and the totality of the circumstances here, Solorio was not seized within the meaning of the Fourth Amendment. Because there is no dispute that Solorio had parked her car of her own volition, the encounter was initially less coercive than a regular traffic stop. Her car's egress was not obstructed in any way, and Flores—who began as the only officer on scene—made no contact with Solorio. When Basurto arrived two minutes later, he approached Solorio alone from the opposite side of the car. Although Flores and Basurto were in uniform and armed, there is no suggestion that they gestured to or displayed their weapons or that they acted with a show of force or authority.[5]

Contrary to Solorio's arguments, the other facts of her encounter with Basurto do not transform it into a nonconsensual one under the Fourth Amendment. Solorio places great emphasis on the fact that a uniformed and armed officer approached her and immediately requested her identification without informing her that she was free to leave, but the cases she cites are distinguishable. In *Brown*, officers stopped a defendant on foot and asked for his identification, and after he declined to provide it, the officers frisked and arrested him. *Brown v. Texas*, 443 U.S. 47, 48–49 (1979). In that case, there was no question that the officers had seized the defendant; instead, the question before the court was whether the seizure was justified by reasonable suspicion or another law enforcement objective. *See id.* at 50–52. Accordingly, the *Brown* Court did not address whether the defendant was seized at the moment of an otherwise noncoercive request for identification, which is the question before me now.

Solorio also relies on *Landeros*, wherein an officer "commanded" that the defendant passenger in a car provide his identification after a lawful traffic stop. *United States v. Landeros*, 913 F.3d 862, 865 (9th Cir. 2019). After the defendant declined to provide identification, two officers made several more commands that he do so. *Id.* The court determined that officers had unlawfully extended the traffic stop without reasonable suspicion because the first officer did not

---

[5] Because the bodycam was not turned on, Basurto's tone of voice unknown; however, he used a light rather than authoritative tone during the early back-and-forth with Solorio as reflected on the bodycam footage. As discussed below, by the time his tone because more authoritative, he had reasonable suspicion to seize Solorio.

suspect the defendant of underage drinking as he did the car's other passengers. *Id.* at 868–69. *Landeros* does not help Solorio. Not only did the encounter occur in the more coercive context of a traffic stop, but there was no question that the first officer "commanded" the defendant's identification. Here, by contrast, according to Solorio's declaration, Basurto "immediately asked for" her identification. Solorio Decl. (Linker Decl. Ex. A) ¶ 5.

In short, Basurto's identification request cannot be isolated from the totality of the circumstances; it is not enough to make this encounter nonconsensual. *See United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) ("Absent indicia of force or aggression, a request for identification or information is not a seizure or investigatory stop."). I acknowledge Solorio's assertion that it is "preposterous" to imagine that she could have simply driven away after such an identification request from a uniformed and armed officer. Reply 5; *see* Solorio Decl. ¶ 4 ("Because I saw the police vehicle park behind me and shine the light on my car, I did not believe I could leave."). She expresses a feeling that others surely share: that the law of consensual encounters does not accurately describe individuals' lived experiences with the authority law enforcement. But that law commands the conclusion I reach in this case.

That said, as described below there is no doubt that officers had reasonable suspicion to seize Solorio later in their encounter with her.

## II.  WHETHER OFFICERS HAD REASONABLE SUSPICION

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014) (internal citation omitted). "Reasonable suspicion . . . is dependent upon both the content of information possessed by police and its degree of reliability," both of which are assessed under the totality of the circumstances. *Alabama v. White*, 496 U.S. 325, 330 (1990). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (internal citations omitted).

Solorio argues that an evidentiary hearing is required before I can decide whether officers

had reasonable suspicion to detain her, but the factual disputes she raises are premised on a finding that Basurto had seized her by the time he approached the passenger window and requested identification. Because of the timing described above, an evidentiary hearing is unnecessary. Solorio does not contest Basurto's assertion that he saw and smelled non-tobacco smoke emanating from the car's glove compartment. *See* Basurto Decl. ¶ 6. Further, the bodycam footage corroborates his declaration because it shows him repeatedly asking Solorio what was being smoked and accusing her lying when she evades his questions.

Because the appearance and smell of smoke gave Basurto reasonable suspicion to detain Solorio, I need not address Solorio's challenge to Basurto's contention that foil with burn marks was in plain view in the car.[6] Further, there is no need to address the impact of Membrila's search condition or admission that he had foil on him,[7] or the car's connection to Macdonald-Douglas.[8] Solorio's challenge to the search of the vehicle is premised on her contention that the initial seizure was unlawful.

**CONCLUSION**

For the reasons stated above, the motion to suppress is DENIED.

**IT IS SO ORDERED.**

Dated: July 15, 2020

William H. Orrick
United States District Judge

---

[6] Solorio's declaration states that no foil with burn marks or other drug paraphernalia was visible in the car. Solorio Decl. ¶ 6. Where the bodycam footage shows something reflecting off the light from Basurto's flashlight, Solorio asserts that it "could have just as easily been a burrito wrapper, candy wrapper, foil used to wrap other food, or something else that is reflective." Reply 8; *see* Basurto BCF 0:28.

[7] Solorio argues that given the timing and the darkness, it would have been impossible for Flores to see Membrila in the car or observe him exiting it as his declaration states. *See* Mot. 2, 7; Flores Decl. ¶ 6. Further, she asserts that Membrila's search conditions did not provide a basis for search of the vehicle because the officers did not know the specifics of those conditions.

[8] I am highly skeptical that officers' prior encounters with Macdonald-Smith involving the same car could have provided reasonable suspicion to search the car, especially given that Macdonald-Smith was not present. *See* Oppo. 20–21.